Case No. 14-1869, Darrell Ewing v. United States of America, oral argument not to exceed 15 minutes per side. Mr. Connor Blair for the appellate. Mr. Blair. Good morning, Your Honor. May I please report? Speak up a little. Connor Blair for Petitioner, Mr. Darrell Ewing. With me at Council Tables at this hour. I would like to reserve three minutes for rebuttal time. Your Honors, Mr. Ewing seeks or amends for an evidentiary hearing regarding his ineffective assistance of counsel in breach of agreement claims. First, the record in this case strongly corroborates Mr. Ewing's claim that he relied upon ineffective assistance when he accepted the Rule 11 plea agreement with the government. Is it that clear? Your Honor, I would note that what we hear today is not so much to decide as a matter of law whether his counsel was ineffective. No, I mean, I'm talking about whether he relied on it or not. The record is, there is evidence in the sentencing hearing as well as in the three sworn affidavits. But there's also evidence in the Rule 11 colloquy, isn't there, that kind of refutes his claims? Your Honor, there are two pieces of ineffective assistance advice. First, he was advised that he would receive custody credit towards both his state and federal sentences for a certain time he spent in federal custody. We submit that that was not addressed at plea colloquy. The district court never asked him about it. What didn't he say? You had a plea agreement, right? Not you, but Mr. Ewing. He had a plea agreement, and Judge Duggan says, Are there any other promises or agreements made to you other than what's in this document? Nope. That's correct. However... Nobody? I mean, he didn't say anything. Well, yeah, Judge. They promised me that I'd get credit. That's correct. Well, you know, I'm pretty sure, aren't you? You're a CJA lawyer, but you know that the Bureau of Prisons is the one that gives credit. That's correct. So, I mean, you can promise anything. It wouldn't happen because it's not the function of the court or the lawyers. It's the Bureau of Prisons. That's correct. First, who ultimately gets the sentence is not so much an issue here as to the ineffective advice that he received. Oh, I understand. I understand, but why would he tell him something that he didn't tell the court about? Well, that actually came out at the sentencing, right? That there was a letter? Correct. There's a separate outside agreement. There are two agreements that are not incorporated into the plea agreement. There's first the concurrence that his sentences, his federal and state sentences, would run concurrently to one another. And second, that the government at the sentencing hearing would recommend a prison sentence of 144 months. I can't hear the end of your sentences. There were two outside agreements to the plea agreement. First, that was one that was evidenced by a letter that his federal and state sentences would run concurrent to one another. And second, an oral agreement between the government and Mr. Ewing, that the government at the sentencing hearing would recommend a sentence of 144 months. Don't the cases say that you can't have an IAC claim for ineffective assistance for a claim like this if the court went through a proper colloquy? Generally, yes, Your Honor. What we submit is that the advice, especially regarding custody credit, was not cured by the plea colloquy. The judge said, are there any outside agreements? Mr. Ewing said, no, but legal advice is not an outside agreement. Mr. Ewing is entitled to rely on his lawyer's legal advice. Okay, I wasn't talking about that. I was talking about the 12 years, the 144 months. Correct. Okay. So to the other piece of legal advice, there was a very brief discussion back and forth, I think three or four lines in the transcript, where the district court judge said, have you agreed to a particular sentence? What's interesting about the plea colloquy is that Mr. Ewing said he agreed to two different sentences. He said at first he had agreed to a 168 to 210 month range, which was incorrect. And then the very next line, he reaffirmed that this was the sentence he had agreed to. Then he acknowledged that he had agreed to a 144 month to 204 month sentence, which ultimately was what he had actually agreed to. We submit that to the extent the plea colloquy evidences anything, it really evidences that Mr. Ewing wasn't really sure or didn't know what he had agreed to. He claims he agreed to two different sentencing ranges, which was not correct. Counsel, as I understand it, there's two claims. One has to do with the 144 months and one has to do with the 10 months. Is that correct?  The 144 months, there was this language at the sentencing hearing which arguably dealt with that and arguably supports the denial of a hearing. And ultimately, we're just here as to whether there should be a hearing or not. Is that correct? So it seems to me that your stronger argument, perhaps, is the argument about the 10 months. At least from my, I can't speak for my colleagues, that's the one that troubles me more. And I'm curious about that one. But the trouble I have with your position with respect to the 10 months, this is 10 months of whether your previous time in jail counts. Right? They didn't really talk about that at the sentencing hearing. It came up very briefly. It came up initially when trial counsel stated in open court that Mr. Ewing should be getting custody credit. District court quickly said, no, that's not correct. That's not the law. Later in the sentencing hearing, Mr. Ewing states, Your Honor, please take into consideration that I've been incarcerated for all the relevant times. This implies that Who says that? Mr. Ewing. Ewing himself says that? Yes, Your Honor. Okay, go ahead. This is evidence that he did, in fact, rely on this particular piece of advice before he accepted the plea agreement. But is it even plausible that he would have changed his mind based on those 10 months when he's agreeing to this huge sentence anyway? And it's going to be concurrent with his death sentence in the state court. Your argument only wins if the district court abused its discretion in not having a hearing in this regard, right? That's correct. And it's a little hard for me to see how the court abused its discretion when there's more evidence that it was a mistake, but there's not much evidence that the mistake would have made any difference to him. Are you with me? It's just hard to see that that ever – I think the judge could easily have said to himself, there's no way in the world that's going to make him make a difference. It may give him some argument later, but it's not going to make a difference. If I explain to him very clearly now, do you really want to continue with your plea, given that you're not going to get this because you're not going to get it, certainly he's going to say, yes, sure, I still want the plea, isn't he? His affidavits, as well as his mother's and his sister's affidavits. After the fact. Yes, Your Honor. Nonetheless, they all three very clearly state that but for his custody credit advice, he would not have accepted the plea agreement. That's the only evidence on the record that we have to – No, we have his statement in the plea colloquy to Judge Duggan, that there isn't any other agreements that's affected my plea. I'm assuming they do it just the same way up in, what is it, Detroit, I guess, yeah? That we do in Kentucky. We make him say that under oath. So why have a hearing where he's – you've already got his statement under oath, but it's contrary to what he's saying here. We don't think that district courts should require defendants, particularly lay defendants like Mr. Ewing, to raise issues of nuanced law at plea colloquy when he was unprompted. The district court asked, is there any other outside agreements which have induced you to take – This was not Mr. Ewing's first voyage on the sea of criminal justice, was it? No, Your Honor. Oh. Nonetheless – How could it – Oh, go ahead. I'm going to ask – I'm kind of asking the same question you are, though. Any sentence that he got from the federal court was going to be served concurrently with the state sentence, and he got that part of it, right? Yes, Your Honor. What he's fussing about is a 10-month period, but what does 10 months mean when he's going to get – he's serving all his sentence with – is it a death penalty? I mean – It's a life sentence, Your Honor. You said death penalty. Oh, yeah. I'm sorry. But, I mean, life sentence, 10 months here, I mean, what difference does it make? Your Honor, this is, I think, precisely why we need an evidentiary hearing, to determine exactly – to determine whether or not he did, in fact, rely on this piece of advice. The record is inconclusive at best.  Sure. But they're after the fact. The affidavits are after the fact. And when asked, right, from the get-go there, this plea colloquy, he said, nope, there are no outside promises. Nobody's promised me anything. He could have said, well, you know, I was told that this would be run concurrent with the state and I'd get credit for all my jail time. Well, if he had said that, if he had said that, the answer would have been, just like Judge Duggan said at sentencing, you can't get credit if you're getting credit on another sentence. That's the response. So then he'd say, okay, well, I guess I'll keep my plea because I'm getting a pretty good deal on the whole thing anyway. Well, didn't he try to withdraw his plea when he found out he wasn't getting 144? He did try to withdraw his plea at the sentencing hearing after he had found out that he wasn't going to get the concurrence, that he wasn't going to get custody credit, nor was the government going to recommend. You talked about the 144 at that time, not about the custody credit. He attempted to withdraw his plea agreement after both of those had been. At sentencing? Yes, Your Honor. You know what the rules said about that, though, don't you? Yes, Your Honor. Rule 32 is pretty adamant about when you can withdraw it. It's things to consider. Nonetheless, it is evidence on the record that he would not have accepted the plea agreement, but for facilities. 144. But is it clear on the record that the 10 months would have made a difference? It's not necessarily clear, but that's exactly what we're arguing. It's inconclusive. I see. Your Honor, I see my time is up. If I said death sentence, I meant life sentence, so I apologize for misspeaking. I thought it was life sentence, but not when you said death sentence. No, no. Death sentence, this is not a death penalty case, and it never was, but there is a state life sentence, right, until death. Okay. Sorry for that. Please. Thank you for your argument. Please proceed, counsel. Good morning. Mark Jastine for the United States. I think that Your Honors have really hit on the key issue here, and as I believe Judge Rogers, you said, the issue really is whether the district court abused its discretion in denying an evidentiary hearing. That's really the only issue before this court and the only one that was certified for appeal. I'd like to turn to the issue of the custody credit, because I think as Judge Rogers and perhaps Judge Hood indicated, it's pretty clear that any alleged promise with regard to 144-month sentences is starkly contradicted by the record in this case. The plea colloquy in which Judge Duggan asked Mr. Ewing twice whether there were any other agreements, and he twice said no. He specifically asked Mr. Ewing if he understood what the sentence recommendation was or the sentence that the parties had agreed to. Counsel, it seems to me that, I mean, we have a rule, and the rule is that the court won't find the prejudice prong of an IAC claim if you have that type of colloquy. That I'll give you, but I think anyone who, I shouldn't say anyone, I think one very fair reading of this transcript is that this man truly believed that there was an agreement for a 144-month sentence, and, in fact, his lawyer sort of believed that, and the prosecutor wasn't even sure that he, I mean, it took a while to get to the point where he was definite that there wasn't such an agreement. So this isn't a case where the defendant's just making something up, you know, that there was this agreement. I mean, there was some real question about it, and it seems to me that it's very clear that at least the defendant thought that. Now, you can talk about whether that was justified or not and whether he should have piped up at the plea hearing, but I think that's a very fair reading of the record, and I think the only thing that stands in the way of relief is that rule, that, you know, that's the law in this circuit, that if you have that colloquy, we're not going to find the prejudice prong of an IAC claim. But I don't think that that necessarily applies to this second issue where the lawyer clearly thought that this was something that his client was going to get. So, I mean, it's not a leap to say that this is what the defendant, Mr. Ewing, thought as well. Well, you're right, Your Honor, that the law is very clear, that even if Mr. Ewing had the subjective belief that the government was going to recommend a 144-month sentence, the plea colloquy, the integration clause, all of that stands for the proposition that this court will not hear those claims, and that's in the Baker case in Ramos v. Rogers. It's very clear that that kind of claim cannot be raised in an ineffective assistance unless Mr. Ewing were to show extraordinary circumstances, such as that he'd been told a lie to Judge Duggan. There's no record that he hasn't even claimed that he was told a lie to Judge Duggan about the existence of this supposed outside agreement. So let's turn to the custody credit issue. Well, I just was reading your comments to Judge Duggan, and you were kind of ambivalent about what exactly went on. That's correct, and if you take a close look at the transcript, you'll see what happened is that Mr. Ewing's attorney even said in his sentencing memo before we got to the sentencing hearing that the agreement was for a range of 144 to 204 months. He began his colloquy with the court at the sentencing hearing, saying that the parties had agreed to a range of 104 and that he hoped that the court would follow that. And you can see at a certain point in the transcript where he says that Mr. Ewing was talking to him while I was talking about the difference between the sentencing guideline range and the agreed-upon range. And it's at that point that all of a sudden this claim comes up that I had agreed to make this recommendation. And so, honestly, I was taken a little bit aback by that, having this about-face by the defense during this hearing, and was trying to recall this. I think Mr. Ewing was maybe the last of eight or nine defendants who had pled guilty in this case, specifically what our recommendation, our discussions had been. But regardless, this is why we have integration clauses. This is why we have plea colloquies, so that there isn't this kind of dispute about what was discussed and negotiated beforehand. And the court's been very clear that we don't allow someone to come in and say, well, you told me this, this, and this, when you have an integration clause and a plea colloquy such as we have in this case. 144 was the bottom end of the guidelines as originally calculated. Is that correct? No, it's actually lower than the sentencing guidelines range. And there was some lack of clarity at the sentencing because Mr. Evans kept referring to the sentencing guidelines and Judge Duggan wanted clarification about what the guidelines were, so there was some discussion about it. Well, no, but I think the guidelines changed, didn't they? They actually went up. Yes, because they found some criminal history. Correct. The probation found some criminal history and that raised the guidelines, the bottom end of the guidelines. Of the guidelines range. As opposed to the original 144 months, which was the bottom end of the guideline, wasn't it? The bottom end of the guidelines was never 144 months. What we're dealing with here is an agreed-upon sentencing range, which was lower than the sentencing guidelines range. I believe the parties had calculated the guidelines range at the bottom of it at 168 months but had agreed under the C plea that the court should sentence between 144 and 204 months. Is that a C-1C plea? Right. Isn't that kind of binding on Judge Duggan? It is. If he didn't, uh-oh. So if he had a C-1C plea and you all had a C-1C plea, didn't he have to give the defendant the opportunity to withdraw his guilty plea? If he were to impose a sentence above 204 months, which he did not. He imposed a sentence of 180 months. The plea was to the range. Correct. He pleaded the range. Not to a specific number. And so Judge Duggan sentenced within the agreed-upon range of 144 to 204 months. So let's turn to the custody credit issue. And, again, this is something that Mr. Ewing's claim has kind of transformed over time. When Mr. Blair was standing at this podium, the court asked about, you know, did he really rely on this? And I think it's interesting that the defense in this case has tried to cast that claim as different from the 144, although I will grant that the record is not as clear on that. I will note that if the court actually looks at the affidavit that Mr. Ewing submitted in support of his motion, he said that he was misinformed by Mr. Evans that the prosecutor had agreed to a 144 sentence run concurrent with credited time for being in federal custody. So he is saying that Mr. Evans told him that the prosecutor, me, promised 144 and credit. If that was a promise, an agreement that he believed that the prosecutor had made, as this court has recognized, it was incumbent upon him to tell Judge Duggan that at the time that he entered his plea. He did not. So that's point one. Point two, at the sentencing hearing, Mr. Evans did argue for custody credit. That does not mean that that is actually what he had advised him, number one. But number two, this discussion did come up. Assumably he advised him that it was possible if he was arguing for it. He might have. He might have. And even if we assume that he did, again, it was incumbent upon Mr. Evans to indicate that that was a reason for his guilty plea. But he did not. After discussion, after Judge Duggan and I both made very clear that we did not believe that Mr. Ewing would get custody credit, Mr. Ewing never raised it again during the sentencing, even after he attempted to withdraw his plea. He never raised it at all without being in conjunction with the 144 claim, sort of separately stating this 10 months would have made a difference to me? Never until he submitted his affidavit on the 2250. In the affidavit he says that it's independently sufficient. Right. And when was that? That's after this court dismissed his direct appeal. I see. Finding that there was nothing in the record to support his 144-month claim, I think Mr. Ewing recognized at that point that he needed to supplement his issues a little bit. But you say he didn't raise it again, but he did raise it after there was that colloquy about the credit, and then he spoke and said? He did not. Mr. Ewing did not ever mention custody credit at the sentencing. And what you've seen is they've attempted to say, well, he wanted the court to take into account that he'd been in custody all this time. If you look at the record, what he refers to is he says the years 2009, 2010, 2011. That's well before he was even charged in this case. He was indicted in this case in November of 2011 and didn't even appear on the indictment until February of 2012. And so what he was talking about there was the offense conduct. He was saying he wanted the court to take into account that he was actually in state prison during much of the time span of the conspiracy alleged in the indictment. And so it was really to take that into effect as a 3553A factor, history of the offense, that kind of thing, not saying that he wanted custody credit. He specifically said when he was withdrawing his plea several times that he referred to the 144 agreement. And you can look at pages 3080, 3086, and 3094, where he specifically talks about the 144 month or promises by the prosecutor. He never once says that his plea was induced by his belief even, much less a promise from anybody that he was going to get custody credit. Well, that kind of makes sense because, I mean, one is a much bigger difference. I'm not sure it means that the other one didn't matter. I'm also not sure that, well, maybe they do. I don't know. It's sort of a nuanced issue, whether you get credit for that time, whether the court can even give you credit for that time because the lawyer was obviously a bit confused about that. So I'm not sure that I would necessarily expect a defendant to articulate back to the sentencing judge what that problem is. Well, I guess my point isn't so much that Mr. Ewing needed to understand the intricacies of awarding credit or not. It's that if he believed he was going to get credit as part of the sentence, if he had been told that, if he'd been told that I had promised that or that this was a significant underpinning of his plea, he would have said it at the plea, first of all. But even then, even if he didn't, if the court says he didn't need to, at the sentencing where it's been very clear that the court is not going to award him that credit, he surely would have said, wait a second, my plea was predicated on two things, 144-month recommendation from the government and this representation that I was going to get credit. But what is the harm? I mean, I understand that that's all weighing against him in terms of what Judge Duggan would decide if he had a hearing, but what's the harm with letting him come before the court and explaining it in his own words as to why he believed this if he really did believe it and why he claims that it affected his decision? Well, I'll have two responses to that. One, the standard isn't abuse of discretion. So even if you could say, well, it would be okay to have a hearing, the question is whether Judge Duggan abused his discretion, and he clearly did not. But secondly, this court and the Supreme Court have outlined what the harms are. And blackledged by the Supreme Court and in Baker, the courts have said that the court should not allow indiscriminate hearings or risk eliminating the chief virtues of a plea system, which are speed, economy, and finality. And that's why extraordinary circumstances are required when a defendant says something that contradicts the record to explain why that which Mr. Ewing. But we know it doesn't contradict the record because his lawyer actually thought it. Well, again, it doesn't matter what his lawyer thought. It matters what Mr. Ewing actually relied upon in entering his plea, and the record has at best. The record is silent on that. We don't know what he relied upon. I think we do have that. When he says that he relied solely upon the 144 recommendation, which is what he said at sentencing, that he thought he was going to get that, he said, I relied on this 144-month promise. That is echoed again repeatedly throughout the direct appeal, by the way, where they say solely, solely, solely. There's a difference between a promise and how things operate. So if somebody's entering a plea, the promise is, okay, what range did you agree to? The question whether you're going to get credit for this isn't something that's part of an agreement because you didn't even have the authority to agree to it. So it's not something that's a matter of agreement that you would expect to be on the record. It's something that, you know, your lawyer tells you, you say, well, what about this time? And your lawyer either says, oh, you automatically get credit for it because you were there, you know, being held on this charge, or no, you can't get credit for it because you were doing a state sentence. So it's not something that you would expect to be on the record. Well, I agree that this is a topic that's often not addressed in plea colloquies because it is just a part of the fabric of the law in this area. But I would go back to two points. One, if Mr. Ewing really believed this, he would have said it at the sentencing, at least by then when it's been made clear that he probably was not going to get it. And number two, in his affidavit, he presents that it was an agreement with the prosecutor, that he was told that I had agreed that he was going to get the credit. And again, if he thought there was an agreement, then again this is where the plea colloquy and the integration clause come into play. But he says that he thought it because his lawyer told him. He said his lawyer told him that I had agreed to that is what he says in his affidavit. Maybe the lawyer had told him that. Just because you never would have told him that doesn't mean the lawyer didn't tell him that. The whole argument is that the lawyer was ineffective, right? Even if his lawyer had told him that prior to the plea, the plea colloquy and the integration clause that he signed would wipe out that claim. Because he was asked, is there any agreement other than this plea agreement that induced your plea? Correct. And he was incumbent when he said no, or to say yes actually, if he believed that there was an agreement between you and Mr. Evans. That's correct. Unless he was told there was no promise, it's just this is what's going to happen. So if his, this is Judge White's point, if what the lawyer did, speaking hypothetically, was say don't worry, you'll get 10 months less because the rule is you'll get custody credit. And then they're asked, is there a promise? Anyone would say no, there's no promise. But it has been explained to me what's going to happen. So I don't see how the promise eliminates that. Do you see what I'm saying? Well, I understand what you're saying, Judge Rodgers. I just don't follow that last point. I understand the point that there's not very much in there that shows that it made a difference to him. But that's different from saying there's not enough evidence in there that he was told the wrong thing. Well, it contradicts his affidavit, and it contradicts the affidavit of, I believe, his sister, who also said that they were told by Mr. Evans that the prosecutor had agreed to the credit. So the genesis of this belief, apparently, according to their affidavits, was that the prosecutor had told them that he was going to get this credit. Had told them or had told Evans? Had told Mr. Evans and Mr. Evans. Right. So the allegation is that Evans was ineffective. Right. And misled them about what he was promised from the prosecutor. He listens to the prosecutor and gets confused and relays to these people the wrong thing, ineffectively. There's no answer to that to say you didn't do it. But it is an answer to say that if they understood that there had been an agreement for credit from the government, and this was allegedly this conversation with Mr. Evans happened before the plea, just before the plea, that it was incumbent upon Mr. Ewing to tell the court. Why was it incumbent upon them? When they asked about a promise and there was no promise, there was just a description of what the law is. He said there was an agreement.  for a 144 recommendation run concurrent with credit for time served. Okay. Thank you. Thank you. Just a couple of things, Your Honors. I'd first like to point out that although the standard is abusive discretion, this court has repeatedly stated that petitioners are entitled to an evidentiary hearing unless the record conclusively shows that they're entitled to no relief. And this is a relatively light burden. Additionally, this court has not hesitated when the record is inconclusive to remand for an evidentiary hearing. For instance, in Huff v. U.S. and Smith v. U.S. and most recently in Pola v. U.S., this court has remanded for an evidentiary hearing on ineffective assistance claims. Okay, sir. What would be the result of this evidentiary hearing? What could be the possible result for this evidentiary hearing? Your Honor, we can't predict the future, but we would elicit testimony from Mr. Ewing's trial counsel as well as Why didn't you do that ahead of time? Why didn't you do that in accordance with this motion for 2255? There was no hearing to elicit testimony. No, I mean, but you got an affidavit from Mr. Ewing and his sister and his mother. Why couldn't you get an affidavit from Mr. Evans? In all candor to the court, I don't have an answer for that. I would submit that in cases where the court has remanded for an evidentiary hearing, the record is more conclusive than this case. In those cases, in several of them, the allegedly ineffective attorney had submitted an affidavit that contradicted petitioner's claims. In this case, the only affidavits are those that corroborate Mr. Ewing's claims. No, you've got Mr. Ewing's statement on the record that there was no other agreement. Mr. Ewing stated on the record there was no agreement to 144-month records. Well, I mean, he says now there was an agreement to get credit. But when I asked, he didn't mention that. He didn't mention that whatsoever. That is correct. He did say there was no agreement. However, I think Judge White and Judge Rogers, you made good points when you say Hey, don't promote them too soon. that there is no reason for a lay defendant like Mr. Ewing to understand the nuances of federal law and raise them without prompting by the district court to say, yes, my lawyer had advised me as to this, this, and this, even though there's not an agreement. Well, he's dramatic enough to tell his mother and his sister. You think he's going to tell his mom and not tell the judge? Your Honor, it's not clear from the record when he told his family members that he hadn't gotten what he wanted. I know, but I mean, if it was enough of him to say, Mom, they told me that I'd get credit for this 10 months, why didn't he think it was wise enough to respond to Judge Nugent? There's no reason to believe that he didn't know at plea colloquy that he wasn't going to get custody credit. No, he didn't know, but he said he was going to say, I have an agreement with the prosecutor. We have an agreement with the prosecutor. And Mr. Chastain could have then come up and said, No, we didn't have any agreement. Where did you come up with that? I think the distinction to be made is that this wasn't an agreement between the government and Mr. Chastain. Precisely, and that's where you run into problems. Again, silence on the record is rarely conclusive. You just come to the dance with the girl that you brought, right? That's correct, Your Honor. Okay. Well, it's perhaps not an easy case, but we'll take it under consideration. We appreciate your argument. When you say it wasn't an agreement, what are you saying? It was advice from Mr. Ewing's counsel to Mr. Ewing that he would receive custody credit towards both sentences, which was affirmatively incorrect advice. It was not an agreement. But your opposing counsel says that in the affidavit he based that on the fact that it was agreed that he wouldn't get custody credit. In the affidavit, Mr. Ewing states, Had I not been given incorrect advice about the credited time, I would receive and not been told about the 144-month recommendation. He says there it's incorrect advice. So it's just incorrect advice in the affidavit. But there's nothing prior to the, this was my question, there's nothing prior to the affidavit that's consistent with the idea that this would have made any difference. It's only the affidavit. So the reason perhaps more deference is due to the district judge, is the district judge was there for all of these proceedings. That's correct. He does state at the sentencing hearing on page 3087, I would like the record to know that I have been currently incarcerated during all the relevant times and indictment. This is contrary to what Mr. Chasteen said. And to take that into consideration, I was serving prison time. Although this is not an explicit— That's 3553A factors. That's one of the things that you have to consider in any case. That's correct. But it could be, and the record's not conclusive, which is our— But he didn't say, he didn't say I was promised. I was promised that I would get. My attorney told me that I would get 10 months' custody credit for—he didn't say that. It's not explicit. We acknowledge that it's not explicit. Our argument is that there's nothing in the record to conclusively refute Mr. Ewing's claims. Okay. Thank you, Your Honors. Well, Mr. Blair, we see that you were appointed under the Criminal Justice Act, and we appreciate your advocacy under that as an appointed lawyer for the defendant. Keep up the good work. The case will be submitted. And we'll take a slight pause before we call the next case.